I'm Robert Jobe and I'm appearing today on behalf of the petitioner Lakbir Singh. At the outset, I need to point out that the parties in this particular litigation have widely differing views about the scope of this court's jurisdiction. The government seems to think that this court is not limited to the reasoning of the immigration judge and could sustain the immigration judge's negative credibility finding on grounds that the immigration judge himself did not adopt. We believe that is patently incorrect and that the IJ's negative credibility finding has to either rise or fall on the reasoning set forth in the immigration judge's decision. That is, as this court has said in a slew of cases, we must examine the record to see whether substantial evidence supports the IJ's conclusion and determine whether the reasoning employed by the immigration judge is fatally flawed. Now, despite the clear circuit precedent that we focus in on the reasoning of the immigration judge, the government has offered us a number of reasons that the immigration judge did not embrace and quite frankly are simply wrong. For starters, the government says Mr. Singh, quote, failed to proffer proof that he was a member of the Akali Dal party, although he had two years to do so after being placed in proceedings. Well, that's true. He didn't offer proof that he was a member of the Akali Dal. He wasn't a member of Akali Dal. He testified he was a supporter. He never said he was a member. In fact, the only support that he testified to having offered was he voted for Akali Dal. Can't imagine what sort of corroborating evidence he's going to present to show that he voted for Akali Dal. On page 35 of its brief, the government argued that, quote, Mr. Singh proved his ignorance of the political group in which he claimed membership by suggesting that Akali Dal supports the formation of a separate Sikh state. This is nonsense. Mr. Singh testified, and I believe this is on page 129 of the administrative record, that he supports a particular faction of Akali Dal. It's Akali Dal Man. It's the one that we're accustomed to seeing in these cases, because it is the one faction that supports the Sikh separatist movement. And the fact that Akali Dal Man supports the Sikh separatist movement is laid out on page 198 of the administrative record in the country profile, where it says that Simranjit Singh Man, the leader of Akali Dal Man, announced his support for the Sikh separatist movement. On page 33 of its brief, the government relies on a State Department country profile to argue that, quote, there's a high level of misrepresentation in these Sikh asylum cases. In support of that statement, the country profile says that there's an INS office in Delhi that has conducted investigations and confirmed such misrepresentations. It's on page 187 of the record. Counsel, let's suppose that we were sympathetic, that those were reasons that the IJ might have offered, but did not offer, and therefore inappropriate for us to consider. You still have to get over a hurdle, but the IJ has found your client not to be credible on the stand. Right. Would you go to the question of credibility? Yeah. No, I agree. I mean, the immigration judge made a negative credibility finding in this case, and he gave four reasons for that. And as we laid out in our brief, none of those four reasons either comply with the law of this circuit or are supported by substantial evidence. The first three are simply confusion about dates. The final one is the birth certificate issue. And I guess I might as well address that one first, because we didn't say much about this in our brief. The immigration judge was concerned that the birth certificate that Mr. Singh offered has a stamp from a police station. The IJ found it improbable that Mr. Singh's mother would have gone to this police station, the very police station from which these police officers had come searching for her son, in order to get this stamp. Well, what's troubling about that is that Mr. Singh never testified that his mother went to the police station. If you look at the record when he was asked, do you know how your mother got these documents? He said no. That's it. The IJ's belief that the mother went to the police station and got the stamp, it's pure conjecture. It's pure speculation. The real problem, counsel, as I understand it, is that Mr. Singh testified that this was a birth certificate that he had seen before, and it clearly could not have been a birth certificate that he saw before. That's true. He indicated that he'd had a birth certificate. He'd seen his birth certificate in India, and this particular birth certificate has a late registration. It's registered in May of 1998, I believe. He testified that this is a replacement birth certificate, and in all probability, his parents had to re-register his birth. And there's no evidence to support the IJ's suggestion that that's implausible. Was he ever asked, this exhibit, whatever it was, this birth certificate, is this the birth certificate? Are you saying this is the one here at the hearing is the one you saw back in India? Nothing as explicit as that, but at some point, he did sort of suggest that the one in front of him was the one that he'd seen. It wasn't as explicit as you're saying, but yeah, there was a suggestion like that. And then he looked at the date of registration, and he said, no, it can't be. This is not the one from India. This is a replacement. And the thing about the late registration, we have no idea why there was a late registration. I mean, it makes sense. It's possible that whenever you go get a birth certificate, you need to register it again. I don't know. It's possible that the old records were destroyed by fire, or who knows? We don't know. It's pure speculation on my part, as it was on the part of the immigration judge, to suggest that his testimony that you can't, if you're going to get a replacement birth certificate, you have to re-register it. It's just speculation to suggest that that can't happen. This goes to the question, counsel, as to whether Lakhvir Singh was who he claimed to be. Yeah. When he entered the country, he gave officials at the border a different name. He – Well, I'm not sure about that, Your Honor. We had some confusion about – we had some confusion about dates. What you're saying there about him giving a different name at the time he entered the United States, I don't believe that's true. I'm sorry. I'm sorry. I have confused two cases, one of which is not before us this morning. I apologize for that. Let's take – let's back up, counsel. Uh-huh. Let's go to the question of the photos, please. Yeah. Well, with regard to the photos, the big issue on the photos relates to the family, you know, these family photos. And the issue is, when were they taken? The thing that troubles me about this particular issue is the immigration judge made the man guess. When he was asked when were these photos taken, he said two times, I don't know. I don't know when they were taken. So then the next series of questions – But he did – he did say, I was 16 when these photos were taken. After he'd said, I don't know when the photos were taken, the immigration judge asked him a third time. How could he have been so far wrong, though? Well, let me – let me just explain more precisely what happened. The immigration judge asked him, how old were you? And he said, well, I may have been 15, 16, or 17. You know, he gave three – three – it's clear the guy didn't know. Mm-hmm. You know, when the picture was taken. But even at 17, those – those photos could not have been taken when he was 17. Well, I'm not – I'm not really sure of that, Your Honor. I can't tell from those photographs, you know, how old the kids are in those pictures. And I don't know that the immigration judge could tell with any certainty. But the other thing that amazes me about this particular – that I think is important about this particular issue is, then on cross-examination, the issue came up again, and the government lawyer asked him, well, how old were your brothers in those pictures? And in response to that question, he said, well, maybe they're 15 and 13. Well, 15 and 13 would mean that the pictures were taken at some point in 1996, months before the father disappeared, and that makes perfect sense. You have a situation where the man's forced to guess when the pictures were taken. He gives, you know, wildly – he's making guesses. He doesn't – he says, I was 14, 15, 16, 17. But he goes on to say, well, maybe my brothers were 15 and 13, and those ages actually make perfect sense. Yeah. Of course, if his brothers were 15 and 13, then he would have been 20. So we have a three – we now have a four-year gap between saying, well, I was 16 or 17 – or 15, 16. That would be a five-year gap. I might have been 15 or 16. No, they must have been 15 and 13, which would make me – which would make me 20. It's a three-year gap. I mean, if you're saying he was actually 20 at the time the pictures were taken, he estimated he was 15, 16, or 17. The basic problem here, Your Honor, he's forced to guess. He's looking at a picture. These are his brothers. This is his family. Right. But when they – And it goes to an important question, which is whether he is testifying truthfully in representing who he is. And we can't even get ages right here. But see, the important thing is what was the question asked of him. He's not even in the picture. He's not – he's not looking at a picture of himself. When he was asked, How old were you? He's looking at some pictures of his brother, and he says, I was 15, 16, 17. When they ask him the more direct question, How old are your brothers? He's looking at the picture. He says, My brother's 13, 15. 13 and 15 makes perfect sense. The other – the other date question here is the date the police first visited his home after his father's arrest. His father was arrested on March 13, 1997, and then the police came to his home. They asked him, Well, when was that? He said, March 30th. And then he goes on to say, Well, maybe it was during the first week of April. At some point during that conversation, he misspoke and he said, First week of March. I mean, again, this is just clearly an example of him misspeaking. It's some confusion about the dates. There's no confusion about the sequence. He makes clear that the police came to his home after his father's arrest. It was a short time afterward. There's no confusion about that. The confusion comes in only when he's forced to identify. Was it April or May or March? And he misspoke one time. I'm running out of time here, so I need to reserve the balance of my time. Thank you, Mr. Joe. Ms. Curtis. May it please the Court, my name is Rena Curtis, and I represent the government in this matter. We need to get bigger desks, I think. The other one is bigger in the other courtroom. I guess I'll start with the whole mischaracterization that the photograph problem deals with confusion. In fact, it doesn't deal with confusion at all, nor does the immigration judge talk about it dealing with confusion. The immigration judge talks about other dates and confusion, but this one, he's basically saying that the Petitioner is being untruthful about these photographs because it appears to the immigration judge that he's purposefully backdating the date of these pictures. It was not reasonable for the Petitioner to look at these pictures and say, oh, yeah, I was 15, 16, or 17 in these pictures, knowing that his brothers are 13 to 15 in those pictures, but his brothers should be, you know, 9 or 10, or, you know, 12 or 13. I got the impression from reading the record that the Petitioner kept saying he didn't know when these pictures were taken, and the I.J. just wouldn't take no for an answer and kept badgering him. Right. Finally, the guy gave an answer, and, you know, he says, I don't know, I don't know. Absolutely. I would invite the judge to please read that portion of the transcript. It's just a few pages, because Petitioner's counsel has done a very good job of making it appear as if he's being badgered by the immigration judge, and he's so confused, and he's just, you know, guessing at some date, and he gets it wrong. That's not at all what happened. What's going on is his own counsel, Petitioner's own counsel, has five pictures there. They're all the same, you know, time, but they're trying to lay the foundation for the pictures. To recognize this picture, you know, when was it taken? So that's why he testified. What was the purpose for introducing these pictures? I mean, that's not generally part of an affirmative case that's required by INS in order to, in order to. You know, I can't tell you. I think it was a really bad idea for him to introduce the pictures. I think that he starts testifying about the pictures, and he realizes, uh-oh, I'm not in the picture. But it's quite a leap, isn't it, for the I.J. to go from saying these boys can't be of this age, and therefore, they must have been taken in 1998, and that's after the date when your father would have disappeared. Therefore, your father couldn't have disappeared, so you're lying about everything else. Well, I think if you look at the totality of the testimony about this, I mean, basically, he testifies to this. He was 15, 16, or 17 when this picture was taken. It was taken during a religious ceremony. It was at the ceremony. But this was saying I was 15, 16, or 17 before or after he said he didn't know the date it was taken. It was after. After he'd said it several times, as a matter of fact, right? Twice when his counsel asked him, he said, oh, I don't remember. And then later on, it appears that actually there – it appears that the judge might have said where were they – where were they taken instead of when were they taken, because the response is they were taken at a religious ceremony, and I was about 15 or 16. And then he goes on – there's no confusion. Then he goes on. Well, why aren't you in the picture? Oh, it was at my aunt's house. Okay. Where is your aunt? The aunt that lives, you know, in Mejari. And, you know, where are your parents? Oh, my parents are at my neighbor's house. You know, was this guy 20 when he went to his aunt's house during this particular religious ceremony, or was he 16 years old? I mean, it's a little bit of a difference there. And the judge was not persuaded that, you know, he's testifying credibly. I think the problem is the Petitioner is purposefully backdating the document. Why? Because there's a problem with it. He got it afterwards. His brothers are old in this picture, and he's not in it. And why is he not in it? Because he's in the United States. And what's the problem with it? Because if he's in the United States and these pictures are taken and his dad's in it, that means the whole crux of his case, that his dad disappeared before he came to the United States, is gone. So I think that's why he's giving implausible testimony right there on the stand, like, yeah, my brothers are 13 or 14 in that picture, and I was 15, 16, or 17. And then later on, it's the, you know, the judge and the service that put it together, you know, and they start doing the arithmetic, well, your brothers should be 5 and 7 years younger than you, so why is this guy giving implausible testimony on the stand that his brothers are, you know, between 13 and 15, and he was 15, 16, or 17? I mean, that doesn't make any sense. So that is a flat-out – it looks like a flat-out untruth to the immigration judge, and it goes to the heart of Petitioner's claim that his dad was missing. Kennedy. Which of his statements are untrue, the statement that he didn't know when the picture was taken or his estimation of his age? Well, I would say that the testimony surrounding the picture and when the picture was taken and the estimation of his age. Let's talk about the birth certificate. Sure. Well, the issue with the birth certificate is, you know – This could not possibly have been the actual birth certificate that he saw in India, right? That is correct. That's what it appears from the, you know – Well, the date on it. Well, there are two dates, and it doesn't appear that this would be a clerical error, either, because – May I finish my question? Sorry, yes. I apologize, Your Honor. The date on it was after the time that he entered the country. That's correct. So it could not possibly have been the birth certificate that he actually saw in India. That is correct, sir. So what's wrong with his testimony? What was wrong with his testimony is he had originally testified when his counsel was submitting the birth certificate that this was the document that he had seen in India. So then later on, on cross-examination, they point out the registration date, that the registration date was May of 1998. So the birth was not even registered until then. So then the question becomes, well, how could you have seen this birth certificate and, you know, it not be registered until after you came here? And then he offers a suggestion, well, it must be a replacement. And then, you know, it appears from the testimony, the sequence of the testimony that he was indicating that his mother had sent him a package and that this all came from his mother, and the immigration judge said that he thought it was highly suspicious that the mother would go down to the very place that allegedly killed her husband, that allegedly was hounding her and her family for the whereabouts of her boy, and, you know, basically – But that again is – takes a big leap by the I.J. When we don't have any testimony as to sort of who's running the birth certificate bureau down at the police stations, is this a separate desk, a different window? They don't ask, they don't care, they just provide – it's like providing a replacement birth certificate. They simply date it to the day that you request it. I mean, there's some big leaps here by the I.J. Yes, it could be that could be the case that you have to go to the chief of police who's prosecuting you, but on the other hand, maybe the chief of police is saying, gosh, is your kid applying for asylum in the United States? Well, good riddance, I'll be happy to give you a birth certificate, in which case, you know, there's completely different inferences that could be drawn here. Absolutely. I absolutely agree with you. And I think that that's the point, is that, you know, reasonable minds can differ, but was the judge unreasonable? And is there – You have pure speculation on the part of the judge as to what went on in that police station. Now, the one point on which – on which Singh is trapped is this question as to whether he said, this is the birth certificate I saw in India. And he does back – does backtrack on that. But that – that doesn't seem to me to be so critical. The birth certificate is being submitted evidently to show that he is who he is and that he is of a – of a particular – of a particular age. But the – but the – but the IJ seems to have sort of wandered off the – off the track here. Okay. Well, you know, definitely there's, you know, room to come to two completely reasonable conclusions. And the immigration judge in this particular case came to the reasonable conclusion that he believed that it was very unlikely that anyone, whether it be the mother or anyone related to Lokvir, would actually go down there and seek the birth certificate when they were actively pursuing him and that that would draw undue attention if a threat, a death threat, truly existed and if they were actually truly terrified. I mean, you'd be pretty scared to go down to the police station that allegedly murdered your father, you know. So I think that that's where the immigration judge was going with that. And absolutely, you know, now we can come to two different conclusions. But has Petitioner shown anything that compels a contrary conclusion? And could the immigration judge could reasonably come to that conclusion? I think he could have. I guess I'm still not clear what the significance of the birth certificate problem is. Is it – is it your contention that the birth certificate was a forgery? No, I don't believe that that's the contention at all. Okay. So, I mean, if it's his birth certificate, where does all this leave us? Well, I think that goes back to the fact that it was registered in May of 1999. I mean, May of 1998, after he came to the United States. Okay. And then what? So what do we – what do we draw from that? Well, the thing that you draw is if there's truly a threat existing in India and it's from this particular police station that apparently is hounding his family consistently, that, you know, no family member or no one's going to go down there and draw attention to the family if, you know, if a true threat exact – actually existed there. I think that's the – the crux of the problem. I think we understand your argument. Thank you, counsel. We'll hear rebuttal. Okay. Thank you very much. Can I ask you one question, Mr. – if you prevail, what happens? We remand it for further proceedings with a direction to disregard the adverse credibility finding? Yes. Yes. Under Ventura, that's as far as you go. Ventura remand? Yeah. Okay. Thank you. Thank you, Your Honor. That's it for me. Thank you very much. Thank both counsel for their arguments, and the Court will stand and recess, and this case will be submitted for decision. Thank you very much, both of you.
judges: Hawkins, Silverman, Bybee